# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| MELINDA K. DAVIDSON,<br><br>        Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>        Defendant. | CASE NO. 3:22-CV-00938<br><br>DISTRICT JUDGE JAMES R. KNEPP, II<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Melinda K. Davidson ("Plaintiff" or "Ms. Davidson") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

## I.        Procedural History

Ms. Davidson filed her SSI application on June 18, 2020, alleging disability beginning June 18, 2020.[1] (Tr. 32, 217-23.) She asserted disability due to anxiety, depression, post-traumatic stress disorder, panic attacks, Sjogren's syndrome, and venous insufficiency. (Tr. 92,

---

[1] Ms. Davidson had a prior SSI application which resulted in a decision dated September 16, 2015, finding her not disabled. (Tr. 32, 83-86, 111-30.)

102, 142, 146, 232.)  Her application was denied at the initial level (Tr. 138-42) and upon

reconsideration (Tr. 144-46).  She then requested a hearing.  (Tr. 147.)

      On March 16, 2021, a hearing was held before an Administrative Law Judge ("ALJ").

(Tr. 52-82.)   The ALJ issued an unfavorable decision on May 4, 2021, finding Ms. Davidson

had not been under a disability since June 18, 2020, the date the application was filed.  (Tr. 29-

51.)  Plaintiff requested review of the decision by the Appeals Council.  (Tr. 214-16.)  The

Appeals Council denied her request for review on April 5, 2022, making the ALJ's decision the

final decision of the Commissioner.  (Tr. 1-7.)

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

      Ms. Davidson was born in 1978.  (Tr. 46.)  She was 41 years old when she filed her SSI

application.  (Tr. 46.)  She obtained her GED, and received vocational training for medical

secretarial work.  (Tr. 46, 60.)  Her past relevant work includes jobs as a chiropractor assistant

and medical receptionist.  (Tr. 61-63.)  She worked as a chiropractor assistant for a little over a

year, until March 2020.  (Tr. 61-63.)  She also tried to work part-time in a cafeteria at Apollo

Career Center later in 2020.  (Tr. 63-64.)

### B.     Medical Evidence

#### 1.     Relevant Treatment History

      Beginning in 2018, Ms. Davidson received treatment at MidWest Surgical Specialists

("MidWest") for lower extremity pain.  (Tr. 325, 330, 333.)  Jeremy Heffner, M.D. was the

supervising physician at MidWest.  (Tr. 325.)  Ms. Davidson also treated with primary care

providers at Health Partners of Western Ohio ("Health Partners") for general health care

concerns, B12 injections, and mental health treatment prior to the alleged onset date (Tr. 335,

349-438, 449-506, 507-08, 596-713) and during the relevant period (Tr. 335, 336-48, 507-08, 509-95, 714).

### i.    Physical Impairments

In March 2018, Ms. Davidson had a lower extremity venous exam which showed that she was a candidate for radio frequency ablation of the right great saphenous vein, right perforator veins, and left great saphenous vein.  (Tr. 325.)  On April 9, 2018, the left lower extremity vein ablation was performed.  (*Id*.)  Ms. Davidson did not return for the right lower extremity vein ablation.  (*Id*.)

Ms. Davidson returned to MidWest on February 25, 2020 for a lower extremity venous exam due to varicose veins of the left lower extremity with pain.  (Tr. 319-23, 325, 333.)  The exam showed no evidence of DVT (deep venous thrombosis) or SVT (superficial vein thrombosis), but there was evidence of deep system venous insufficiency, superficial venous insufficiency, an incompetent saphenofemoral junction, and great saphenous vein reflux below the knee.  (Tr. 319.)

Ms. Davidson saw Natalie Coon, PA-C at MidWest on March 13, 2020 for follow up to review the results of the ultrasound.  (Tr. 330.)  She reported decreased activity with her left leg with aching, cramping, and edema pain in her left leg.  (Tr. 331.)  She reported symptom improvement in her right leg.  (*Id*.)  She reported that her symptoms affected her ability to stand, walk, and sit for long periods.  (*Id*.)  She said she could walk more than a block, but walking made her sore and she could not walk long distances.  (*Id*.)  She said pain started to set in after a few minutes of standing, but she could continue to stand for thirty minutes.  (*Id*.)  She reported that she could prepare meals and drive.  (*Id*.)  Her examination showed palpable foot pulses, normal bilateral capillary refill in her feet, trace bilateral swelling, varicose and spider veins in

the left lower extremity, and spider veins in the right lower extremity.  (*Id.*)  She was diagnosed with varicose veins of the left lower extremity with pain and thrombophlebitis of the superficial veins in the left lower extremity (Tr. 330) and was determined to be a candidate for radio frequency ablation of the left great saphenous vein BK (Tr. 325).

During a behavioral health visit with Daphne Lindo, LISW-S, at Health Partners on May 18, 2020, Ms. Davidson reported that she was bored because she could not engage in exertional activity due to loss of feeling in her left leg.  (Tr. 596.)  She had an ablation of the left great saphenous vein BK scheduled for June 1, 2020.  (Tr. 324, 326, 329.)  It was noted that she had failed conservative therapy.  (Tr. 324.)

A venous duplex conducted on July 7, 2020 showed no evidence of DVT or SVT, but there was evidence of deep system venous insufficiency.  (Tr. 316-18, 326, 328.)  The vein ablation in the great saphenous vein BK appeared complete.  (Tr. 316.)

Ms. Davidson attended an appointment for a B-12 injection with Barbra Forest, CNP, on July 15, 2020 at Health Partners, where CNP Forest observed her musculoskeletal examination, gait, and stance were normal and she was in no acute distress.  (Tr. 340, 342-43, 587, 589-590.)

She returned to PA Coon at MidWest on July 24, 2020 for follow up.  (Tr. 325-27.)  She reported that she still had significant pain in her left lower extremity and could walk less than a block.  (Tr. 325-26.)  She also reported symptoms of aching, cramping, itching, and redness with color changes.  (*Id.*)  She said that her pain occasionally interfered with her activities of daily living, and she could not run, jog, or exercise.  (*Id.*)  She said she could not prepare meals, and could only stand five to ten minutes.  (*Id.*)  Her examination showed palpable foot pulses, normal bilateral capillary refill in her feet, trace bilateral swelling, varicose and spider veins in the left lower extremity, and spider veins in the right lower extremity.  (*Id.*)  She was diagnosed with

varicose veins of the left lower extremity with pain.  (Tr. 325.)  A repeat ultrasound was ordered with further evaluation to follow.  (*Id.*)  No subsequent MidWest treatment records were submitted to the ALJ prior to the issuance of her decision on May 4, 2021.[2]

Ms. Davidson complained of anxiety and depression and received a B-12 injection at her well visit with CNP Forest on August 17, 2020.  (Tr. 578, 581.)  She was in no acute distress and her musculoskeletal examination, gait, and stance were normal.  (Tr. 580-81.)

During a behavioral health visit with Ms. Lindo on September 14, 2020, Ms. Davidson reported that the problems with her legs had become more complicated than she anticipated.  (Tr. 564.)  She said future surgeries were scheduled and she felt overwhelmed with the possibility that more surgeries would be needed.  (*Id.*)

Ms. Davidson saw CNP Forest for a checkup and B-12 injection on September 14, 2020, and reported she had a vascular procedure on her left leg on August 31, 2020 and was "[d]own in the dumps [because] of what she [was] going through with her veins and her boyfriend."  (Tr. 569.)  She was in no acute distress and her musculoskeletal examination, gait, and stance were normal.  (Tr. 571-72.)  CNP Forest counseled Ms. Davidson on proper diet and encouraged physical activity.  (Tr. 572.)

When Ms. Davidson saw Ms. Lindo on October 19, 2020, she reported improvement in her leg following surgery.  (Tr. 555.)  She was in no acute distress and her musculoskeletal examination, gait, and stance were normal when she saw CNP Forest for a checkup and B-12 injection on that same date.  (Tr. 559, 561-62.)

During an appointment with Ms. Lindo on December 21, 2020, Ms. Davidson reported she was doing better following knee surgery and was starting a new job as a cafeteria worker at

---

[2] Ms. Davidson submitted additional records to the Appeals Council (Tr. 13-28), but the only records relating to treatment at MidWest were dated June 2021, subsequent to the ALJ's decision (Tr. 2, 14-15, 24-28).

Apollo.  (Tr. 528.)  She saw CNP Forest that same day for a checkup, medication refills, and a B-12 injection.  (Tr. 532.)  She was in no acute distress and her musculoskeletal examination was normal.  (Tr. 534-35.)  Her gait and stance were also normal.  (Tr. 535.)

Ms. Davidson saw CNP Forest on January 18, 2021 for a checkup.  (Tr. 523.)  On examination, she was in no acute distress and her gait and stance were normal.  (Tr. 526.)  CNP Forest counseled Ms. Davidson on proper diet and encouraged physical activity.  (*Id*.)  Ms. Davidson also saw Ms. Lindo on January 18, 2021.  (Tr. 519.)  She reported she was no longer working because of her leg pain, and needed additional medical intervention.  (*Id*.)

During a February 16, 2021 appointment with CNP Forest for a B-12 injection, Ms. Davidson's musculoskeletal examination, gait, and stance were normal.  (Tr. 514, 517.)  CNP Forest counseled Ms. Davidson on proper diet and encouraged physical activity.  (Tr. 517.)

### ii.      Mental Health Impairments

Ms. Davidson received treatment for her anxiety and depression at Health Partners beginning in August 2018.  (Tr. 550.)  She continued with treatment for her mental health conditions at Health Partners prior to (Tr. 335, 349-438, 449-506, 507-08, 596-713) and after her alleged disability onset date (Tr. 335, 336-48, 507-08, 509-95, 714).

CNP Forest prescribed Ms. Davidson's mental health medications, which included Paxil, Depakote, and Klonopin.  (Tr. 345, 357.)  At a behavioral health appointment with Ms. Lindo on May 18, 2020, Ms. Davidson reported that she was off work until August 2020.  (Tr. 349.)  She reported increased anxiety because her leg problems prevented her from engaging in physical activity and because of her temporary job loss.  (*Id*.)  She presented as anxious on examination but her appearance, grooming, memory, speech, intelligence, judgment, behavior, thought processes, thought content, insight, and affect were normal or not impaired.  (Tr. 351.)

6

When Ms. Davidson saw Ms. Lindo on July 15, 2020, she was anxious and had shortness of breath. (Tr. 336.) She reported that she was doing okay, but had increased anxiety because her dog was terminally ill, and she was anxious about being alone without her pet. (*Id*.)

Ms. Davidson returned to Ms. Lindo (Tr. 574-77) and CNP Forest (Tr. 578-82) on August 17, 2020. She reported to Ms. Lindo that she quit her job due to pain and poor circulation in her lower extremities. (Tr. 574.) She said she was going to need vascular surgery and stents in the coming weeks. (*Id*.) She was disappointed that her coworkers had not reached out to her and seemed indifferent towards her when she was not working. (*Id*.) Ms. Lindo noted a history of anxiety, depression, sleep disturbances, and loss of interest in activities. (*Id*.) Ms. Davidson reported feeling stressed over the loss of her pet, Covid-19, and her job loss, and also reported feeling isolated. (Tr. 575.) She presented as anxious and depressed on examination but her appearance, grooming, memory, speech, intelligence, judgment, behavior, thought processes, thought content, insight, and affect were normal or not impaired. (Tr. 576.) She also reported to CNP Forest that she was stressed about the loss of her pet and Covid-19. (Tr. 579.) CNP Forest prescribed Depakote for bipolar disorder, current episode manic without psychotic features, unspecified, and Klonopin for generalized anxiety disorder. (Tr. 581-82.) No mental status examination findings were recorded by CNP Forest.

Ms. Davidson returned to CNP Forest on September 14, 2020 for a checkup and B-12 injection. (Tr. 569.) She said she was "[d]own in the dumps [because] of what she [was] going through with her veins and her boyfriend." (*Id*.) She reported stress due to losing her pet, Covid-19, losing her job, and feeling isolated. (Tr. 570.) CNP Forest prescribed Paxil for major depressive disorder and advised Ms. Davidson to follow up in one month. (Tr. 573.) No mental status examination findings were recorded by CNP Forest.

Ms. Davidson also saw Ms. Lindo on September 14, 2020.  (Tr. 564-68.)  She reported feeling overwhelmed due to ongoing and possible future surgeries on her legs.  (Tr. 564.)  She said she felt in control, but that she could "be negative when she 'punishes [her]self with negativity.  Everyone disappoints her.'"  (*Id*.)  She presented as depressed, self-contemptuous, anxious, irritable, and tearful on examination but her appearance, grooming, memory, speech, intelligence, judgment, behavior, thought processes, thought content, and insight were normal or not impaired.  (Tr. 566.)  Ms. Lindo supported Ms. Davidson in her personal health goals for management of her chronic illness and they discussed lifestyle changes.  (Tr. 566-67.)  Ms. Lindo encouraged self-care techniques, including relaxation techniques, deep breathing, and hobbies.  (Tr. 567.)  They discussed Ms. Davidson's negative self-talk and Ms. Lindo encouraged Ms. Davidson to actively work on self-affirmations.  (*Id*.)  Ms. Davidson was instructed to continue with her medications as prescribed and to consider counseling.  (*Id*.)

Ms. Davidson returned to Ms. Lindo on October 19, 2020.  (Tr. 555-58.)  She reported being upset regarding "multiple areas on her personal and professional life."  (Tr. 555.)  She described herself as "depressed, not wanting to be alive" and said she was pushing people away.  (*Id*.)  She said she felt "victimized by her life."  (*Id*.)  She was no longer in counseling.  (*Id*.)  She said that she and her partner were not communicating with each other.  (Tr. 556.)  She denied plan or intent for self-harm.  (Tr. 557.)  She presented as unhappy, dysphoric, self-contemptuous, anxious, and irritable on examination.  (*Id*.)  Her appearance, grooming, memory, speech, intelligence, judgment, behavior, affect, thought processes, thought content, and insight were normal or not impaired.  (*Id*.)

Ms. Davidson returned to see CNP Forest (Tr. 550-54) and Ms. Lindo (546-49) on October 22, 2020.  She told CNP Forest that she had stopped taking her Depakote and Paxil

several months earlier because she was irritable and depressed and had tremors.  (Tr. 550.)  She reported to Ms. Lindo that she had not stopped taking her Klonopin.  (Tr. 546.)  She told Ms. Lindo that Depakote made her feel "strange and jittery."  (*Id*.)  She reported to CNP Forest that she was experiencing "mood variability" since stopping her medications. (Tr. 550.)  No mental status examination findings were recorded by CNP Forest.  Ms. Lindo observed that Ms. Davidson's mood was unhappy, depressed, irritable, and euthymic.  (Tr. 548.)  Ms. Lindo also observed on examination that Ms. Davidson's grooming, appearance, memory, speech, intelligence, judgment, behavior, thought processes, thought content, and insight were normal or not impaired.  (*Id*.)  CNP Forest prescribed Celexa and Abilify.  (Tr. 553-54.)

Ms. Davidson returned to CNP Forest for follow up regarding her anxiety and depression on November 23, 2020.  (Tr. 537-41.)  She also saw Michelle Claypool LISW-S at Health Partners.  (Tr. 542-45.)  She reported to CNP Forest and Ms. Claypool that her depression was down from a ten, with ten being the worst, to a four or five.  (Tr. 537, 542.)  She told Ms. Claypool that she continued to feel a loss of independence.  (Tr. 542.)  She reported no other concerns.  (Tr. 542.)  No mental status examination findings were recorded by CNP Forest.  Ms. Claypool observed that Ms. Davidson's mood was euthymic and she had a full-ranging, normal affect that was congruent with her mood.  (Tr. 544.)  Ms. Claypool also observed on examination that Ms. Davidson's appearance, memory, speech, judgment, behavior, thought processes, thought content, and insight were normal or not impaired.  (*Id*.)  There were no changes to Ms. Davidson's mental health medications.  (Tr. 540-41, 544.)

Ms. Davidson returned to CNP Forest (Tr. 532-36) and Ms. Lindo (Tr. 528-31) on December 21, 2020.  She reported to CNP Forest (Tr. 532) and Ms. Lindo (Tr. 528) that her mood was improved.  She also reported to Ms. Lindo that she was starting a new job as a

9

cafeteria worker, and that she and her significant other were getting along better. (Tr. 528.) No mental status examination findings were recorded by CNP Forest. Ms. Lindo observed on examination that Ms. Davidson was anxious, but her grooming, appearance, memory, speech, intelligence, judgment, behavior, thought processes, thought content, and insight were normal or not impaired. (Tr. 530.) There were no changes to her mental health medications. (Tr. 536.)

Ms. Davidson returned to Ms. Lindo on January 18, 2021. (Tr. 519-22.) She reported improvement in her mood and that she was compliant with her medication. (Tr. 519.) She reported that had stopped working because of her leg pain and because she required additional medical intervention. (*Id*.) She said she was overwhelmed with taking care of two puppies that she recently adopted. (*Id*.) She also reported that her relationship with her significant other improved after she restarted her behavioral health medication. (*Id*.) Ms. Lindo observed that Ms. Davidson was anxious on examination. (Tr. 521.) Otherwise, Ms. Lindo recorded normal or unimpaired mental examination findings. (*Id*.) Ms. Davidson also saw CNP Forest on January 18, 2021 for a checkup and complaints of sinus pain and pressure. (Tr. 523-27.) CNP Forest continued to prescribe Abilify and Celexa. (Tr. 527.)

When Ms. Davidson returned to Ms. Lindo the following month, on February 16, 2021, she reported that her medication was working well and her sleep and sense of wellbeing were improved. (Tr. 509.) She also reported that returning the puppies she had adopted was helping with her stress management. (*Id*.) Mental status examination findings were similar to those from her prior visit with Ms. Lindo. (*Compare* Tr. 511 *with* Tr. 521.) Ms. Lindo observed that Ms. Davidson's mood was improving. (Tr. 512.) Ms. Davidson also saw CNP Forest on that day. (Tr. 513-18.) There were no changes to her mental health medications. (Tr. 518.)

2.      **Opinion Evidence**

i.      **State Agency Medical Consultants**

State agency medical consultant Gary Hinzman, M.D., completed a Physical RFC Assessment on August 17, 2020.  (Tr. 96-97.)  Dr. Hinzman opined that Ms. Davidson had the following physical residual functional capacity: she could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds; she could stand and/or walk six hours in an eight-hour workday; she could sit six hours in an eight-hour workday; she could never climb ladders/ropes/scaffolds; she could occasionally kneel, crouch, and crawl; and she could frequently balance, stoop, and climb ramps/stairs.  (*Id.*)

State agency medical consultant Mehr Siddiqui, M.D., agreed with Dr. Hinzman's Physical RFC Assessment on reconsideration on November 30, 2020.  (Tr. 106-07.)

ii.      **State Agency Psychological Consultants**

State agency psychological consultant Cindy Matyi, Ph.D. completed a Psychiatric Review Technique ("PRT") (Tr. 94-95) and Mental RFC Assessment (Tr. 97-99) on October 2, 2020.  Dr. Matyi opined that Ms. Davidson had moderate limitations in her ability to: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  (Tr. 94.)   Dr. Matyi opined that Ms. Davidson had the following mental residual functional capacity: she could understand and remember 1-3 step tasks; she could perform 1-3 step tasks with no high pace or high production quotas; she would be limited to occasional superficial interactions with others; and she would need major changes to a present routine previewed and gradually introduced to allow time to adjust to the new expectations with supervisory support available if needed.  (Tr. 97-99.)

State agency psychological consultant Karla Delcour, Ph.D. completed a PRT (Tr. 104-05) and Mental RFC Assessment (Tr. 107-09) on reconsideration on November 25, 2020.  Dr. Delcour agreed with Dr. Matyi's PRT and Mental RFC Assessment.  (Tr. 104-05, 107-09.)

### iii.    Consultative Psychological Examiner

Brian R. Griffiths, Psy. D. conducted a consultative disability examination on September 16, 2020.[3]  (Tr. 440-47.)  Ms. Davidson stated that venous insufficiency, anxiety, and depression interfered with her functioning and ability to work.  (Tr. 441.)

Ms. Davidson reported she was a victim of physical and sexual abuse as a child and adult. (Tr. 441.)  She was a special education student in school, and got along with her teachers but was bullied by her classmates.  (*Id*.)  She withdrew from school in seventh grade due to anxiety, and later obtained her GED.  (*Id*.)  She reported that she got along adequately with supervisors and patients at her jobs, but struggled to get along with coworkers.  (Tr. 442.)  She thought her coworkers might have perceived her to be standoffish because she was quiet and did not like to talk or be around other people.  (*Id*.)

Ms. Davidson told Dr. Griffiths that she was hospitalized several years earlier due to an overdose.  (Tr. 442.)  She reported that she was participating in counseling with a therapist affiliated with her primary care physician's office.  (*Id*.)  She was prescribed Paxil, Klonopin, and Depakote.  (Tr. 442-43.)  She reported that she struggled with depression, experienced "extreme" mood swings, had racing thoughts and difficulty maintaining attention and concentrating, had paranoid thoughts and did not trust other people, and had anxiety and panic attacks multiple times each week.  (Tr. 443.)

---

[3] The examination was performed using a telehealth platform due to the Covid-19 crisis.  (Tr. 440.)

Ms. Davidson said she lived with her boyfriend but had no friends. (Tr. 443.) She spent her time watching television and using her phone. (*Id*.) She could take care of her own grooming and hygiene, but lacked motivation to do so at times. (*Id*.) She could perform light household chores and fix simple meals. (*Id*.) She shopped online for groceries, explaining that grocery shopping required too much walking. (*Id*.)

Dr. Griffiths made the following mental status examination findings: Ms. Davidson was polite, cooperative, dressed appropriately. (Tr. 443.) Her speech was not pressured or slowed. (Tr. 444.) She exhibited no abnormal thought processes, her receptive language skills were adequate, and her intelligence was average. (*Id*.) She was depressed with a somewhat flat affect, but was not tearful, angry, hostile, or suicidal. (*Id*.) She exhibited no signs of anxiety and there were no indications of obsessions, compulsions, excessive religiosity, paranoid ideation, delusions, or hallucinations. (*Id*.) Dr. Griffiths noted that "[h]er complaints of limited energy and easy fatigability might be suggestive of somatization." (*Id*.) She was alert, responsive, and oriented to time, place, person, and situation. (*Id*.) She was not confused, her remote recall was adequate, she was able to follow the conversation, and she did not ask for clarification or for questions to be repeated. (*Id*.) She could count backwards from twenty by threes without error and mentally calculate twenty-four divided by three, but could not perform serial sevens or manually calculate a quarter of two hundred. (*Id*.) Her judgment appeared sufficient. (*Id*.)

Dr. Griffiths diagnosed Ms. Davidson with: bipolar II disorder, most recent episode depressed, moderate; post-traumatic stress disorder; and panic disorder. (Tr. 445.) Dr. Griffiths opined that Ms. Davidson had the intellect to manage money, but noted that she mentioned a history of careless spending. (*Id*.)

Dr. Griffiths offered his functional assessment of Ms. Davidson's abilities, as follows:

With respect to Ms. Davidson's ability to understand, remember, and carry out instructions, she had the ability to function in the average range of intelligence. (Tr. 445.) She understood and followed simple instructions during the evaluation, performed within normal limits on Digit Span (a task to assess short-term memory), and remembered one of three objects after a five-minute delay. (*Id*.)

With respect to Ms. Davidson's ability to sustain concentration and persist in work-related activity at a reasonable pace, her "remarks suggested that she has difficulty mentally focusing." (Tr. 445-46.) Dr. Griffiths opined that anxiety, depression, and/or trauma symptoms such as intrusive thoughts, flashbacks, and hypervigilance "may interfere with [her] ability to keep up with others." (Tr. 446.)

With respect to Ms. Davidson's ability to maintain effective social interaction on a consistent and independent basis with supervisors, coworkers, and the public, "[h]er remarks suggested that she struggled to get along with other employees." (Tr. 446.) Dr. Griffiths noted that Ms. Davidson "reported that her emotional difficulties cause[d] her to withdraw" and she had no friends. (*Id*.) Although she "interacted appropriately with [Dr. Griffiths], she appeared to be a depressed individual." (*Id*.)

With respect to Ms. Davidson's ability to deal with normal pressure in a competitive work setting, her "description of her employment history suggested that emotional problems previously interfered with her occupational functioning." (Tr. 446.) Dr. Griffiths found her remarks suggested stressful situations: trigger panic attacks; "exacerbate PTSD-related symptoms including, but not limited to, revivification/re-experiencing phenomenon, hypervigilance, hyperarousal, and avoidant behaviors"; and "cause mood extremes such as depressive or hypomanic episodes and/or behaviors." (*Id*.)

14

C.      **Hearing Testimony**

1.      **Plaintiff's Testimony**

Ms. Davidson testified in response to questioning by the ALJ and her counsel at the hearing on March 16, 2021.  (Tr. 58-73.)   She was living with her boyfriend.  (Tr. 59.)   She had her driver's license and could drive herself, but usually had someone else drive her.  (Tr. 61.)

Ms. Davidson said she could not work physically because her chronic venous insufficiency caused pain, numbness, and tingling in her legs.  (Tr. 64.)  It felt like she had "knives and electricity going throughout [her] legs," and she only had relief if she used her elevation pillow to rest her legs or used muscle relaxers.  (Tr. 64, 66, 73.)  She reported that the muscle relaxers "knock [her] completely out."  (Tr. 73.)  She also said she had to elevate her legs "numerous times throughout the day," and described herself as "pretty much homebound" due to her leg problems.  (Tr. 64.)  She said she would not be able to work a job where she was in a seated position unless she had her special pillow and could elevate her legs to help with blood flow.  (Tr. 70.)  She explained that she had to sit upright on her couch with her "special pillow" under her legs to help the blood flow through her legs and to her heart.  (Tr. 72.)  She estimated being able to sit for ten minutes without elevating her legs.  (Tr. 71-72.)  She said that she tried to work for Apollo at the end of 2020 but lasted only two days.  (Tr. 71.)  She could feel pain starting to set in her legs after the first day, and woke up the second day with a lot of swelling and pain in her legs.  (*Id*.)

Ms. Davidson described leg pain from her groin down to her feet, and said any type of physical activity made her pain worse.  (Tr. 66.)  She had recently tried walking, but had to elevate her legs and take a muscle relaxer to relieve her pain after walking fourteen minutes.  (Tr. 66-67.)  Lifting ten or more pounds caused immediate pain throughout her legs.  (Tr. 67.)  She

15

reported that her doctors advised her to exercise to help with her blood flow and venous issues, but that she was unable to exercise because of her plantar fasciitis.  (Tr. 70-71.)  She also reported that she had been having really bad back pain in the morning and needed assistance getting out of bed.  (Tr. 72.)

Ms. Davidson also testified that her mental health impairments impeded her ability to work.  (*Id*.)  Her depression, anxiety, and PTSD caused insomnia and her medications made her tired.  (*Id*.)  She reported panic attacks that occurred with no warning even when she was at home.  (*Id*.)  When she had a panic attack, she was sweaty, felt like she could not breathe, and felt like she was going to have a heart attack.  (*Id*.)

Ms. Davidson discussed the various medical providers that she saw for her conditions.  (Tr. 64-66.)  She was seeing a foot doctor for plantar fasciitis.  (Tr. 65.)  Treatment for her plantar fasciitis included injections and a muscle relaxer.  (*Id*.)  She also had a surgeon who performed surgeries on her legs.  (*Id*.)  She had six or seven procedures between June and November 2020.  (Tr. 72.)  The procedures were painful and she was not sure they really helped.  (Tr. 73.)  Although she could not recall the names of the specific procedures, she reported that her surgeon told her she needed at least three more.  (Tr. 65-66.)  She reported seeing her family doctor and social workers for treatment of her anxiety and depression, and her family doctor also administered B-12 shots.  (Tr. 65.)  She reported meeting with her social worker every month, but had not attended therapy since 2019 because she did not feel a connection with the therapist and did not feel that it was helping.  (Tr. 66.)

She reported that she was able to take care of her self-care needs without assistance, but had to take breaks when doing her hair because she could not stand for too long.  (*Id*.)  She tried to avoid stairs because walking up stairs caused her pain.  (Tr. 59.)  On a typical day, she made

16

coffee after waking up, performed some housework in ten-minute intervals, and read.  (Tr. 67.)

She usually fixed microwavable meals because she could not stand too long.  (Tr. 67-68.)  She

did her grocery shopping online and picked it up or had it delivered.  (Tr. 68.)  She fed her cat,

but her boyfriend took care of the litter box.  (Tr. 68-69.)  She visited with her mom and brother

three or four times each week.  (*Id*.)  She used social media to post pictures and stay in contact

with family who lived out of state and friends from her childhood.  (Tr. 69.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") also testified at the hearing.  (Tr. 73-81.)  The VE testified

that Ms. Davidson's past relevant work included: chiropractic assistant, a medium, skilled

position performed at the light level (Tr. 74); and medical receptionist, a sedentary, semi-skilled

position performed at the sedentary level (Tr. 74-76).  The VE testified that a hypothetical

individual of Ms. Davidson's age, education, and work experience and with the functional

limitations described in the ALJ's RFC determination (Tr. 38, 74-75) could not perform her prior

work, but could perform representative positions in the national economy, including mail clerk,

copy machine operator, and office helper (Tr. 75-76).

In a second hypothetical, the VE testified that the light jobs identified in response to the

first hypothetical would remain available if the individual required: a sit/stand option at will,

while remaining on task 90% or more of the workday; and use of a 6-9 inch foot stool to elevate

her legs at her workstation for four hours or less per day, provided she would not need to sit

more than four hours per day.  (Tr. 77-78.)

The VE additionally testified that there would be representative positions in the national

economy available to a hypothetical individual as described in the second hypothetical who was

limited to sedentary work.  (Tr. 78-79.)  The representative jobs identified by the VE were:
charge account clerk, table worker, and bench assembler.  (Tr. 79.)

The VE testified that there would be no competitive work if the hypothetical individual
would be off task 25% or more of the workday, would need to lie down during the workday
outside of normal breaks, or would miss two or more days per month on a regular ongoing basis.
(Tr. 79-80.)  She testified that an individual would need to be on task at least 90% of the
workday, and that absenteeism should not exceed more than one day per month on a regular
ongoing basis.  (Tr. 80.)  The VE also testified that there would be no competitive employment
for an individual who needed to elevate her legs by sitting with her legs straight out in front, such
as on a couch, instead of using a foot stool.  (Tr. 80-81.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments
depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any
substantial gainful activity by reason of any medically determinable physical or mental
impairment which can be expected to result in death or which has lasted or can be expected to
last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in the
> national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a
five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

18

2.     If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.     If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy. *Id.*

## IV.     The ALJ's Decision

In her May 4, 2021 decision, the ALJ made the following findings:[4]

1.     The claimant has not engaged in substantial gainful activity since June 18, 2020, the application date. (Tr. 35.)

2.     The claimant has the following severe impairments: anxiety, post-traumatic stress disorder (PTSD), depression bipolar disorder, and varicose veins. (*Id.*)

---

[4] The ALJ's findings are summarized.

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 36-38.)

4.    The claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except: she can frequently climb ramps and stairs, never climb ladders, ropes, and scaffolds, and frequently balance and stoop; she can occasionally kneel and crouch; she is limited to performing simple, routine, and repetitive tasks, but not at a production rate pace, for example, no assembly line work; she is limited to simple work-related decisions, and she can respond appropriately to occasional superficial interaction with supervisors, coworkers, and the general public; she is limited to tolerating few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work setting; and any necessary changes need to occur infrequently and be adequately and easily explained.  (Tr. 38-45.)

5.    The claimant is unable to perform any past relevant work.  (Tr. 45-46.)

6.    The claimant was born in 1978 and was 41 years old, which is defined as a younger individual age 18-49, on the date the application was filed.  (Tr. 46.)

7.    The claimant has at least a high school education.  (*Id*.)

8.    Transferability of job skills is not material to the determination of disability.  (*Id*.)

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including office mail clerk, copy machine operator, and office helper.  (Tr. 46-47.)

Based on the foregoing, the ALJ determined that Ms. Davidson had not been under a disability, as defined in the Social Security Act, since June 18, 2020, the date the application was filed.  (Tr. 47.)

## V.    Plaintiff's Arguments

Ms. Davidson argues that the ALJ did not properly evaluate her subjective complaints as to her physical or mental impairments.  (ECF Doc. 11, pp. 11-19; ECF Doc. 14, pp. 1-7.)  She also argues that the RFC is unsupported by substantial evidence, asserting that the ALJ erred in

her evaluation of the opinion evidence relating to both her physical and mental impairments.

(ECF Doc. 11, pp. 19-25; ECF Doc. 14, pp. 7-9.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d

399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ

applied the correct legal standards and whether the findings of the ALJ are supported by

substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the

Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245

F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030

(6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th

Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence

shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006)

(citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a

zone of choice within which the decisionmakers can go either way, without interference by the

courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).

Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide

questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if

substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B. Assignments of Error**

Underlying both of Ms. Davidson's assignments of error is a contention that the ALJ did not fulfill her duty to develop the record and made her determinations based on an incomplete record. (ECF Doc. 11, pp. 12-17, 24-25; ECF Doc. 14.) The undersigned will therefore consider first whether the ALJ failed to appropriately develop the record and then address the specific arguments made by Ms. Davidson in her two assignments of error.

**1. Whether ALJ Met Her Duty to Develop the Record**

Ms. Davidson makes two distinct arguments as to the ALJ's duty to develop the record. First, she argues the ALJ failed to properly develop the record when she did not take independent steps to acquire the records for Ms. Davidson's venous insufficiency treatment at MidWest between August and December 2020. (ECF Doc. 11, pp. 12-17; ECF Doc. 14, pp. 1-5.) Second,

she argues the ALJ should have sought an opinion from her treating physician or ordered a physical consultative examination because the only medical opinions in evidence relating to her physical capacity were the non-examining opinions of the state agency medical consultants. (ECF Doc. 11, pp. 23-25; ECF Doc. 14, pp. 8-10.)  Each argument will be addressed in turn.

### i.        Whether ALJ Had a Duty to Obtain the MidWest Records

The regulations establish that the Commissioner will make "every reasonable effort" to develop the medical evidence in support of an application for disability benefits, including "help[ing]" claimants get medical evidence from their own medical sources.  20 C.F.R. § 416.912(b)(1)(i) ("We will make every reasonable effort to help you get medical evidence from your own medical sources and entities that maintain your medical sources' evidence when you give us permission to request the reports."); 20 C.F.R. § 416.945(a)(3) ("[B]efore we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources.").  That evidentiary development begins during the administrative process that precedes a request for hearing before an ALJ.  (*See, e.g.,* Tr. 93-94 (10/5/20 DDS Analysis of Evidence), Tr. 103 (11/30/20 DDS Analysis of Evidence), Tr. 439-48 (9/16/20 Consultative Psychiatric Exam).)

At the hearing level, the Sixth Circuit explains that an ALJ must act "as an examiner charged with developing the facts" and ensure that every claimant receives a full and fair hearing.  *Lashley v. Sec. of Health & Human Services*, 708 F.2d 1048, 1051 (6th Cir. 1983) (quoting *Richardson v. Perales*, 402 U.S. 389, 411 (1971)).  Nevertheless, "while the ALJ must ensure that every claimant receives 'a full and fair hearing,' the ultimate burden of proving entitlement to benefits lies with the claimant."  *Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022) (quoting *Duncan v. Sec'y of Health & Hum. Servs.*, 801 F.2d 847, 856 (6th Cir.

23

1986); citing 20 C.F.R. § 404.1512(a)), *cert. denied sub nom. Moats v. Kijakazi*, 215 L. Ed. 2d 52, 143 S. Ct. 785 (2023); *see also Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008); 20 C.F.R. § 416.912(a)(1) ("[Y]ou have to prove to us that you are blind or disabled."); 20 C.F.R. § 416.945(a)(3) ("[Y]ou are responsible for providing the evidence we will use to make a finding about your residual functional capacity.").

In special circumstances, an ALJ must "exercise a heightened level of care" in developing the record, "scrupulously and conscientiously prob[ing] into, inquir[ing] of, and explor[ing] for all the relevant facts." *Lashley*, 708 F.2d at 1051-52. But that standard "is best viewed as an extreme example of an ALJ failing to adequately develop the record before it." *Moats*, 42 F.4th at 564 (citation omitted). Heightened care applies to unrepresented claimants who are unfamiliar with hearing procedures and incapable of presenting an effective case. *See Wilson*, 280 F. App'x at 459 (citing *Lashley*, 708 F.2d at 1051-1052); *Trandafir v. Comm'r of Soc. Sec.*, 58 F. App'x 113, 115 (6th Cir. 2003) (citing *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 856 (6th Cir. 1986) and *Lashley*, 708 F.2d at 1051–52). It does not apply to unrepresented claimants who demonstrate a grasp of the proceedings and adequately present their cases, *see Moats*, 42 F.4th at 564; *Wilson*, 280 F. App'x at 459, or to claimants represented by counsel, *see Stevenson v. Kijakazi,* No. 5:20CV2688, 2022 WL 4551590, at *13 (N.D. Ohio Sept. 29, 2022). Since she was represented by counsel at the ALJ hearing, Ms. Davidson's argument for a heightened duty of care in this case (ECF Doc. 14, p. 3) is not well taken.

Ms. Davidson acknowledges that it is her burden to develop the evidentiary record in support of her claim, but argues that her own failure to meet that burden does not negate the ALJ's independent duty to develop the record. (ECF Doc. 11, pp. 12-13; ECF Doc. 14, p. 2.) Because she informed the ALJ of the "missing records and unsuccessful attempts in obtaining

the records," she contends the ALJ should have requested those records before making "multiple negative findings in light of the gap in the records."  (ECF Doc. 14, p. 3; *see also* ECF Doc. 11, p. 14.)  In support, Ms. Davidson cites an internal manual that permits ALJs to request evidence directly from a medical source if the ALJ "finds that the claimant or representative has shown that he or she is unable to obtain the evidence despite good faith efforts or for reasons beyond his or her control."  (ECF Doc. 14, p. 4 (quoting HALLEX I-2-5-13-E).)  What is missing in this case, however, is evidence indicating that Ms. Davidson advised the ALJ she was unable to obtain the records despite good faith efforts or reasons beyond her control, and evidence that she asked the ALJ for assistance in obtaining the outstanding records.

The record does reflect that Ms. Davidson advised the ALJ of her continued treatment with MidWest after July 24, 2020 (Tr. 261-62, 268, 273-74, 281, 304-05) and her additional efforts to obtain the records (Tr. 304-05).  At the hearing, her attorney noted that the record was incomplete and requested another week to submit the records.  (Tr. 56.)  The ALJ said she would not "technically hold the record open," but would admit the records if they were submitted before the decision was filed.  (Tr. 57.)  Ms. Davidson's attorney responded: "Perfect. Thank you."  (*Id.*)  The ALJ then elicited testimony from Ms. Davidson regarding her additional treatment with MidWest.  (Tr. 57-58, 65, 72-73.)  The ALJ did not issue a decision until seven weeks later (Tr. 29-47), when she acknowledged Ms. Davidson's testimony regarding additional MidWest treatment and her reports to other providers regarding that treatment (Tr. 39-40, 43).

During the intervening seven weeks, Ms. Davidson did not submit the outstanding MidWest records, inform the ALJ of specific difficulties in obtaining the records, or request the ALJ's assistance in obtaining the records.  In fact, she reports in her brief: "The record continues to be missing all records from Midwest Surgical Center from July 25, 2020 through the ALJ's

decision dated April 29, 2021." (ECF Doc. 11, p. 14 (emphasis added).)  To date, Ms. Davidson has not provided this Court a copy of the missing records or any explanation for their absence.[5]

While the regulations do require the Commissioner to make "every reasonable effort" to help claimants obtain records from their medical sources, *see* 20 C.F.R. §§ 416.912(b)(1)(i) & 416.945(a)(3), Ms. Davidson seeks to broadly interpret this general obligation to require the ALJ to act independently to obtain medical records even where a claimant was represented by counsel, did not advise the ALJ of any difficulties obtaining the records, and did not request the ALJ's assistance in securing the records.  Given that it was Ms. Davidson's burden to provide evidence to support her RFC findings, 20 C.F.R. § 416.945(a)(3), the undersigned cannot find the ALJ failed in her duty to develop the record when Ms. Davidson advised the ALJ that she was seeking the records but did not request any assistance in securing them.  *See generally Meadows v. Astrue*, No. 1:11-CV-02378, 2012 WL 5205798, at *3-4 (N.D. Ohio Sept. 25, 2012) ("[T]o the extent the record is incomplete, such deficiency is imputed to [the plaintiff] and fails to provide justification for a remand."), *report and recommendation adopted sub nom. Meadows v. Comm'r of Soc. Sec.*, No. 1:11 CV 2378, 2012 WL 5199627 (N.D. Ohio Oct. 22, 2012); *Struthers v. Comm'r of Soc. Sec.*, 181 F.3d 104 (table), 1999 WL 357818 at *2 (6th Cir. May 26, 1999) ("[I]t is the duty of the claimant, rather than the administrative law judge, to develop the record to the extent of providing evidence of mental impairment.").

The recent decision in *Reidenbach v. Comm'r of Soc. Sec.*, No. 5:21-CV-1880, 2022 WL 3043060 (N.D. Ohio Aug. 2, 2022) is instructive.  There too, a plaintiff who was represented by

---

[5] Ms. Davidson did provide the Appeals Council with a MidWest treatment record dated June 7, 2021, one month after the ALJ's decision. (Tr. 23-28.)  That record documents a normal physical examination, except for trace edema in both legs, and notes that Ms. Davidson continued conservative treatment with no symptom relief and planned to discuss possible further procedures, including ablations.  (Tr. 27.)  The "history" section of that record is consistent with Ms. Davidson's testimony that she received further treatment and ablation procedures at MidWest between July and December 2020.  (Tr. 24-25.)

counsel tried to argue that the ALJ had not met her duty to develop the record regarding certain impairments.  *Reidenbach*, 2022 WL 3043060 at *10.  The court noted that the ALJ had no heightened duty to develop the record where the plaintiff was represented and observed that was "especially true given that [the plaintiff] knew of outstanding records bearing on the severity of her . . . impairment but did not submit them in support of her disability claim, her appeal to the Appeals Council, or her appeal to this court."  *Id.* (citation omitted).  The court further explained:

> [Plaintiff] has not attempted to explain why those records were submitted or what those records might have shown . . . . [Plaintiff]'s secondary arguments fail to recognize her role in creating the evidentiary gap which she claims is reversible error.

*Id.* (citations omitted).

The same observations are appropriate here.  While Ms. Davidson has identified the relevant treatment dates, she has not explained why she failed to submit those medical records to the ALJ, the Appeals Council, or this Court.  Neither has she shown that she informed the ALJ of impediments to obtaining the records or requested the ALJ's assistance in obtaining the records.  Because "the ultimate burden of proving entitlement to benefits lies with the claimant," *Moats*, 42 F.4th at 563, the undersigned concludes that the ALJ's failure to independently seek the additional MidWest records did not violate her duty to develop the record.

### ii.    Whether ALJ Had a Duty to Seek Another Medical Opinion

Ms. Davidson also argues under *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908 (N.D. Ohio 2008), that the ALJ "should have requested an opinion from a treating physician or obtained a consultative examination" rather than relying on the non-examining opinions of the state agency medical consultants to support her physical RFC findings.  (ECF Doc. 11, pp. 23-25.)  The Commissioner responds that this argument misses the mark because the state agency doctors considered all of the MidWest records actually in evidence when rendering their

opinions, and there was "no evidence of record that an additional medical source could even review." (ECF Doc. 13, p. 22.)  Ms. Davidson focuses her argument on the state agency doctors' failure to review MidWest records from August through December of 2020. (ECF Doc. 11, pp. 23-25; ECF Doc. 14, pp. 8-9.)  There is no dispute that those records were not submitted into evidence in this case, at the administrative level or before this Court.

As to the first argument, that the ALJ should have requested a medical opinion from Ms. Davidson's treating provider, the Sixth Circuit addressed the Commissioner's duty "to 'make every reasonable effort' to obtain medical assessments from treating physicians" in *Day v. Shalala*, 23 F.3d 1052 (6th Cir. 1994). *Id.* at 1061 (quoting 42 U.S.C. § 423(d)(5)(B)).  There, the court held that the state agency met its duty to "make every reasonable effort" to obtain medical assessments from treating doctors when it sent providers letters with standardized language that included "a question specifically addressing claimants' work-related abilities." *Day*, 23 F.3d at 1061-62.  In contrast, a letter that "did not directly address the claimant's ability to perform work-related activities" did not comply with the duty.  *Id.* at 1061.  Here, the record reflects that the state agency sent MidWest a letter requesting that provider's opinion regarding Ms. Davidson's "ability to do work-related physical and/or mental activities despite the limitations imposed by her medical condition(s)," including "sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, and traveling." (Tr. 311.)  That letter complies with the mandates of 42 U.S.C. § 423(d)(5)(B) as set forth by the Sixth Circuit in *Day*.

As to the second argument, that the ALJ should have ordered a consultative examination, the Sixth Circuit has clearly held that it is within an ALJ's "discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001); *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211,

28

214 (6th Cir. 1986) ("[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant [her] the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination."); *see also Cox v. Comm'r of Soc. Sec.*, 615 F. App'x 254, 263 (6th Cir. 2015) (finding an "ALJ's duty to develop the record" does not necessarily "require the ALJ to order a consultative examination").  The regulations indicate a consultative examination may be appropriate "to secure needed medical evidence, such as clinical findings, laboratory tests, a diagnosis, or prognosis," where such evidence is not contained in a medical source's records or where the medical source's evidence "cannot be obtained for reasons beyond [the claimant's] control."  20 C.F.R. § 404.1519a(b).  As the undersigned observed in Section VI.B.1.i., *supra*, there is no evidence suggesting Ms. Davidson was unable to obtain MidWest's records for reasons beyond her control, or that such difficulty was communicated to the ALJ.

Here, Ms. Davidson has not identified additional clinical findings, laboratory tests, or diagnoses that were needed to complete the evidentiary record.  Instead, she argues that a consultative medical opinion was needed because the "record consists only of diagnostic evidence and no opinion from a medical source regarding functional limitations."  (ECF Doc. 11, p. 25.)  This is simply not true, as the record clearly reflects that the state agency doctors reviewed the diagnostic evidence – including all MidWest records in evidence – and rendered opinions as to Ms. Davidson's functional limitations based on that evidence.  (Tr. 96-97, 106-07.)  Dr. Hinzman reviewed Ms. Davidson's MidWest records through July 24, 2020 and based his August 2020 opinion on consideration of her recent vein ablation procedure and physical examination findings that noted varicose veins, spider veins, no skin ulcerations, and trace

29

bilateral lower extremity edema.  (Tr. 93-94, 97.)  Dr. Siddiqui considered the same evidence and findings and reached the same conclusion in his November 2020 opinion.  (Tr. 106-07.)

Ms. Davidson further argues that the ALJ's reliance on these opinions was in error because it conflicts with *Deskin*, 605 F. Supp. 2d 908, a district court decision from 2008 that attempted to articulate a "general rule" for when an ALJ should seek additional medical opinion evidence.  (ECF Doc. 11, pp. 24-25; ECF Doc. 14, pp. 9-10.)  In a later decision, the same court described the standard as "a narrow rule that does not constitute a bright-line test."  *Kizys v. Comm'r of Soc. Sec.*, No. 3:10 CV 25, 2011 WL 5024866, at *1–2 (N.D. Ohio Oct. 21, 2011).  Generally, these cases argue that an ALJ should obtain additional medical opinion evidence before adopting an RFC finding work-related limitations if: (1) there is <u>no</u> medical source opinion in evidence; or (2) the only opinion in evidence is an "outdated" opinion from a non-examining source "that does not include consideration of a critical body of objective medical evidence."  *Kizys*, 2011 WL 5024866 at *2 (citing *Deskin*, 605 F. Supp. 2d at 912).

*Deskin* is not binding authority, and some courts in this District have criticized or declined to follow the *Deskin* standard.  *See Stevenson,* 2022 WL 4551590, at *14 ("*Deskin*, however, has been criticized by other judges within this District.") (collecting cases); *Adams v. Colvin,* No. 1:14CV2097, 2015 WL 4661512, at *15 (N.D. Ohio Aug. 5, 2015) (collecting cases); *Henderson v. Comm'r of Soc. Sec.*, No. 1:08 CV 2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) ("The Court finds, however, that *Deskin* . . . is not representative of the law established by the legislature, and interpreted by the Sixth Circuit Court of Appeals.").

Courts have also observed that "the Sixth Circuit has not specifically commented on *Deskin* or its progeny." *Reidenbach*, 2022 WL 3043060, at *8 (citations omitted).  Notably, the Sixth Circuit has held that an ALJ did not have a duty to obtain an additional medical opinion

30

despite giving "no weight" to the relevant medical opinions. *See Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018). In so holding, the court observed that it had "previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ." *Id.* (citing *Shepard v. Comm'r of Soc. Sec.,* 705 Fed.Appx. 435, 442–43 (6th Cir. 2017); *Rudd v. Comm'r of Soc. Sec.*, 531 Fed.Appx. 719, 728 (6th Cir. 2013)). Such a requirement, the court had indicated, "would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability." *Shepard,* 705 Fed.Appx. at 442–43 (quoting *Rudd*, 531 F. App'x at 728). The Sixth Circuit has also "held generally that an ALJ may rely on the opinions of state agency physicians who did not have the opportunity to review later-submitted medical records if there is an indication that the ALJ considered such records before assigning weight to an opinion that is not based on the full record." *Stevenson*, 2022 WL 4551590, at *14 (citing *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009); *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007))).

Nevertheless, courts have "held that *Deskin* and its progeny suffice to establish that 'in some circumstances, an ALJ *is* required to obtain a medical opinion in further once his 20 C.F.R. § 404.1545(a)(3) responsibility to develop the record.'" *Reidenbach*, 2022 WL 3043060, at *8 (citing *Falkosky v. Comm'r of Soc. Sec.*, No. 1:19-CV-2632, 2020 WL 5423967, at *6 (N.D. Ohio Sept. 10, 2020) (emphasis in original)).

Ultimately, the undersigned need not decide whether some form of the *Deskin* standard should apply in this case because Ms. Davidson has failed to demonstrate under that standard that a "substantial body of medical evidence . . . came into the record" after the state agency medical opinions she challenges as outdated. *See Kizys*, 2011 WL 5024866. The state agency

31

doctors rendered their opinions on August 17 and November 30, 2020, having considered the evidentiary records at that time and concluded that certain exertional and postural limitations were required to account for Ms. Davidson's vein impairment.  (Tr. 93-94, 96-97, 103, 106-07.) Ms. Davidson's argument that a new medical opinion was required to address the clinical findings in MidWest treatment records from August to December 2020 (ECF Doc. 11, p. 23) must fail by simple virtue of the fact that those records were never submitted into evidence.[6] Indeed, the briefing makes it clear that Ms. Davidson can still offer only speculation as to what medical findings might "presumably" have been included in those records.  (*Id.* at p. 17.)

Further, Ms. Davidson's observation that treatment records for eight appointments with her primary care providers post-dated the state agency opinions does not change the analysis, as she offers no argument as to how those records amounted to a "critical body of objective medical evidence" requiring new opinion testimony.  (ECF Doc. 14, pp. 8-10.)  "There is no categorical requirement that the non-treating source's opinion be based on a complete or more detailed and comprehensive case record."  *See Helm v. Comm'r of Soc. Sec.*, 405 F. App'x. 997, 1002 (6th Cir. 2011) (internal citations and quotations omitted).  "The opinions need only be supported by evidence in the case record." *Id.*  Of course, there must be "some indication that the ALJ at least considered" the later medical records.  *Fisk*, 253 F. App'x. at 585; *Blakely*, 581 F.3d at 409 (quoting *Fisk*, 253 Fed. Appx. at 585).  Here, the ALJ decision reflects that she considered all evidence of record, including the records from Health Partners that post-dated the medical opinions and specifically acknowledged Ms. Davidson's reports that she needed additional leg surgeries and had to stop working because of pain and circulation problems in her legs.  (Tr. 42-

---

[6] For the reasons articulated in Section VI.B.1.i., *supra*, the undersigned has already concluded in that the ALJ did not err in failing to seek out those records.

43.)  Accordingly, Ms. Davidson has failed to demonstrate that the ALJ was obligated to obtain additional opinion evidence under *Deskin*.

For the reasons set forth above, the undersigned finds the argument that the ALJ was required to obtain additional medical records or opinion evidence to be without merit.  Ms. Davidson has failed to show the ALJ had a duty to request additional records or opinions, and therefore failed to prove that the ALJ erred by failing to make such requests.

### 2.    First Assignment of Error: Whether ALJ Properly Considered Subjective Symptoms

In her first assignment of error, Ms. Davidson argues that the ALJ erred in her evaluation of Ms. Davidson's subjective complaints.  (ECF Doc. 11, pp. 11-19.)  She argues that the ALJ did not "identify evidence that would be inconsistent with her allegations" regarding her lower extremity impairments (*id*. at pp. 11-12; ECF Doc. 14, pp. 5-7) and "did not identify an insufficiency of the objective evidence relating to Plaintiff's mental complaints" (ECF Doc. 11, pp. 17-19; ECF Doc. 14, pp. 5-7).  She also argues that "it is impossible to gauge the veracity of Plaintiff's physical complaints in the absence of treatment notes relating to her chronic venous insufficiency and deep venous insufficiency."  (ECF Doc. 11, p. 12.)  The Commissioner argues that the ALJ properly considered Ms. Davidson's subjective allegations in light of the entirety of the record.  (ECF Doc. 13, pp. 11-13.)

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a))*.*  If that requirement is met, the second step is to evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which they limit

33

the claimant's ability to perform work-related activities. *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers,* 486 F.3d at 247. Relevant factors included daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 82 Fed. Reg. 49462, 49465-49466; 20 C.F.R. 416.929(c)(3).

Ms. Davidson argues that the ALJ did not adhere to either of these steps. (ECF Doc. 14, p. 6.) The undersigned disagrees. The ALJ discussed Ms. Davidson's allegations regarding the extent of her mental and physical impairments at length. (Tr. 39-40.) She first acknowledged that Ms. Davidson had severe impairments of anxiety, post-traumatic stress disorder, depression bipolar disorder, and varicose veins (Tr. 35) and concluded that her "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms" (Tr. 40). Next, she concluded that Ms. Davidson's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (*Id*.) Further, a review of the decision reveals that the ALJ considered the entire record, based her findings on multiple relevant factors, and provided "specific reasons for the weight given to the individual's symptoms," SSR 16-3p, 82 Fed Reg. 49462, 49467. The ALJ's analysis is not mere boilerplate.

More specifically, Ms. Davidson argues the ALJ's analysis of her physical symptoms, and in particular her venous insufficiency, was insufficient because "the ALJ failed to indicate which statements were unsupported" and "failed to identify evidence that would be inconsistent with the allegations." (ECF Doc. 11, pp. 11-12.) On the contrary, the ALJ provided the following explanation as to Ms. Davidson's stated symptoms relating to venous insufficiency:

> Though she complained of residual pain and symptoms in her left leg, the records
> show she reported improvement in her left leg symptoms, but later said she was

unable to work becau[s]e of leg pain. Further, she was consistently advised to exercise. She was specifically advised to exercise for 30 minutes 3-5 days a week. The claimant testified that she was advised to exercise to improve her venous condition. Additionally, though she said she continues to elevate her legs with a pillow, there is no evidence that she was advised to elevate her legs on any sort of continuing basis. The claimant's gait and stance were consistently noted to be normal. Her musculoskeletal examinations were normal, and she had no muscle aches, localized joint pain, or joint swelling. The only musculoskeletal examination of note occurred in 2018 when the claimant said she had left back of the knee calf pain that was improved with movement.

(Tr. 45 (citations omitted).)

Ms. Davidson argues the ALJ failed to compare her complaints of venous insufficiency with the records from MidWest (ECF Doc. 11, p. 16), but it is clear that the ALJ considered those records (Tr. 40, 41).  She also argues it was inaccurate for the ALJ to say the "only musculoskeletal examination of note occurred in 2018," given the examination findings in the MidWest records.[7]  (ECF Doc. 11, p. 17.)  On the contrary, the physical exam findings in those records are normal except for "trace" swelling, varicose veins, and spider veins.  (Tr. 326, 331.) The ALJ acknowledged these findings in her decision (Tr. 40), and her characterization of the 2018 examination findings as the only findings "of note" does not mischaracterize the records.

Ms. Davidson also challenges the ALJ's observation that "there is no evidence that she was advised to elevate her legs on any sort of continuing basis" (Tr. 45), arguing that the MidWest treatment records from August through December 2020 would "presumably" contain "additional objective findings[] and instructions to or findings consistent with the need to elevate her legs to reduce symptoms."  (ECF Doc. 11, pp, 15-17.)  This argument is without merit. Theoretical instructions "presumably" contained in records that were not filed in the case are not

---

[7] Ms. Davidson also argues that the ALJ's findings are inaccurate in comparison to the examinations that "presumably" would have been featured in the MidWest records from August through December 2020.  (ECF Doc. 11, p. 17.)  Theoretical findings in records that are not in evidence are irrelevant to the present determination.

evidence that Ms. Davidson was advised to elevate her legs on a continuing basis, and the ALJ accordingly did not err in observing that the record contained no such evidence.

Ms. Davidson also argues that the ALJ's symptom analysis was insufficient because the ALJ found her allegations unsupported based on gaps in the record and improvement in her legs following surgery.  (ECF Doc. 11, pp. 14-17).  As explained in Section VI.B.1. *supra*, the alleged gaps in the record are not the result of error by the ALJ.  Moreover, a review of the decision reveals that the ALJ did not find Ms. Davidson's allegations unsupported because of gaps in the record, nor did she contend that the allegations were unsupported due to a failure to seek or receive further treatment for venous insufficiency.  Instead, the ALJ considered evidence in the record indicating Ms. Davidson was continuing to receive treatment for her lower extremities, including further surgeries, but had generally normal physical examination findings and providers recommended exercise; the ALJ also noted that the record lacked evidence indicating that Ms. Davidson was advised to elevate her legs on a continuing basis.  (Tr. 40-45.)

Ms. Davidson also argues that the ALJ's analysis failed with respect to her mental health impairments because the "ALJ did not explain how summarized records were inconsistent with Plaintiff's allegations," and she "mischaracterized or cherry-picked the examination findings" regarding her mental health impairments.  (ECF Doc. 11, pp. 17-18.)  Certainly, an ALJ may not cherry pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding. *See, e.g., Gentry v. Comm'r*, 741 F.3d 708, 724 (6th Cir. 2014); *Minor v. Comm'r*, 513 F. App'x 417, 435 (6th Cir. 2013).  However, "an ALJ does not 'cherry pick' the evidence merely by resolving some inconsistencies unfavorably to a claimant's position." *Solembrino v. Astrue*, No. 1:10–cv–1017, 2011 WL 2115872, at *8 (N.D. Ohio May 27, 2011).  Indeed, the Sixth Circuit has explained that allegations of cherry-picking evidence by the ALJ

36

are "seldom successful because crediting it would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. Apr. 3, 2014) (citing *White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 284 (6th Cir. 2009)).

In support of her finding that Ms. Davidson's mental health symptoms were not as disabling as alleged, the ALJ found her mental status examination findings were "normal aside from intermittent mood issues." (Tr. 37.) Contrary to Ms. Davidson's contention, the ALJ did not focus only on periods of improvement and ignore evidence of mood variability. The ALJ recounted Ms. Davidson's mental health treatment through the date of the decision, including reported anxiety and depression. (Tr. 42-43.) Both a review of the abnormal findings highlighted in Ms. Davidson's brief and an independent review of the records reveals that Ms. Davidson's mental status examination findings were largely normal, except for mood-related findings such as anxiety, depression, irritability, and a tearful affect. (*See* ECF Doc. 11, p. 18.) This is consistent with the ALJ's characterization of the records.

A review of the ALJ decision further reveals that the ALJ considered that Ms. Davidson maintained a relationship with her boyfriend and mother and was well groomed and cooperative during examinations. (Tr. 44.) The ALJ considered medications used to treat Ms. Davidson's mental health conditions, including the need for changes or adjustments to her psychoactive medications. (Tr. 39, 43.) The ALJ observed that in October 2020, Ms. Davidson reported mood variability but also reported that she had stopped taking Depakote and Paxil four months earlier. (Tr. 43.) The ALJ also considered the medical opinion evidence, including the state agency psychological consultants' opinions and the consultative examiner's opinion, finding their opinions generally consistent with and supported by the evidence showing no more than moderate mental function limitations. (Tr. 43-44.)

The undersigned finds that the ALJ sufficiently explained her reasons for finding Ms. Davidson's subjective allegations not as limiting as she alleged.  The ALJ was not required to "accept [her] subjective complaints." *Jones*, 336 F.3d at 476.  Ms. Davidson has not shown that the ALJ ignored evidence.  The ALJ weighed the entirety of the evidence and credited Ms. Davidson's subjective allegations to the extent she found them supported by the record.  While Ms. Davidson argues that the evidence supports a finding that the symptoms resulting from her venous insufficiency and mental health conditions were more limiting than the ALJ found them to be, it is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387.  The undersigned finds the ALJ adequately considered the subjective allegations in the context of the record as a whole.

For the reasons set forth above, the undersigned finds Ms. Davidson has not met her burden to demonstrate that the ALJ erred in considering her subjective complaints, and the ALJ adequately explained her reasons for finding the subjective complaints were not entirely consistent with other evidence in the record.  Accordingly, the undersigned finds Ms. Davidson's first assignment of error to be without merit.

**3.**    **Second Assignment of Error: Whether ALJ Evaluation of Medical Opinion Evidence Resulted in an RFC Unsupported by Substantial Evidence**

In her second assignment of error, Ms. Davidson argues that the RFC is unsupported by substantial evidence because the ALJ erred in her evaluation of the opinion evidence regarding her physical and mental impairments. (ECF Doc. 11, pp. 19-25; ECF Doc. 14, pp. 7-9.) The Commissioner argues that substantial evidence supports the ALJ's weighing of the medical opinion evidence. (ECF Doc. 13, pp. 20-22.)

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation. 20 C.F.R. § 416.920c(a); *see Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors. 20 C.F.R. § 416.920c(c)(1)-(5). The most important factors are supportability and consistency. 20 C.F.R. §§ 416.920c(a), 416.920c(b)(2). ALJs must explain how they considered consistency and supportability, but need not explain how they considered the other factors. 20 C.F.R. § 404.920c(b)(2).

An ALJ is charged with determining a claimant's RFC based on all the relevant evidence in the claimant's record. *See* 20 C.F.R. §§ 416.945(a)(1); 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009). Nevertheless, the ALJ "is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding." *Poe*, 342 F. App'x at 157; *see also Modro v. Comm'r of Soc. Sec.*, No. 2:18-CV-900, 2019 WL 1986522, at *7 (S.D. Ohio May 6, 2019).

With respect to the psychological opinion evidence, the opinions of state agency psychological consultants Dr. Matyi and Dr. Declour and consultative examiner Dr. Griffiths,

39

Ms. Davidson acknowledges that the ALJ considered consistency and supportability when she found the opinions generally persuasive, but argues the ALJ "cherry-picked findings of [her] treating nurse practitioner" and "ignor[ed] the positive mental status findings in the mental health treatment notes," showing an anxious mood, depressed mood, self-contemptuous mood, irritable mood, unhappy mood, dysphoric mood, and tearful affect.  (ECF Doc. 11, p. 20.)  However, a review of the ALJ decision shows that the ALJ did consider evidence of those positive mood findings, and accurately observed that Ms. Davidson had "normal mental status examinations other than mood issues."  (Tr. 44 (emphasis added).)  Accordingly, the undersigned finds the argument that the ALJ cherry-picked evidence in finding the mental health opinions generally persuasive to be without merit.

Next, Ms. Davidson argues it was inaccurate for the ALJ to state that she accommodated the limitations from the three psychological opinions in the RFC, and provides examples of opinion language she maintains was not incorporated into the RFC.  (ECF Doc. 11, p. 21-23.)  For example, she contends the RFC is less restrictive than Dr. Griffith's opinion because he noted that her "remarks suggested stressful situations trigger panic attacks and that stressful situations cause mood extremes such as depressive or hypomanic episodes and/or behavior" and the RFC "did not account for [her] individualized reaction to stress."  (*Id*. at pp. 21-22.)  She also asserts that the RFC does not include limitations consistent with the state agency psychological consultants' assessments of moderate limitations in: working in coordination with or proximity to others without being distracted by them; completing a normal workday or workweek without interruption; or performing at a consistent pace.  (*Id*. at p. 22.)

On the contrary, a review of the ALJ decision reveals that she appropriately accounted for the psychological consultants' limitations in her RFC.  The ALJ found Ms. Davidson had the following mental RFC:

> She is . . . limited to performing simple, routine, and repetitive tasks, but not at a production rate pace, for example, no assembly line work; she is limited to simple work-related decisions, and she can respond appropriately to occasional superficial interaction with supervisors, coworkers, and the general public; she is limited to tolerating few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work setting; and any necessary changes need to occur infrequently and be adequately and easily explained.

(Tr. 38.)  Consistent with the state agency psychological opinions assessing moderate limitations in working in with or around others, the ALJ limited Ms. Davidson to "occasional superficial interaction" with others.  (*Id.*)  Consistent with stated concerns regarding her reactions to stress and identified moderate limitations in completing a workday without interruption, the ALJ limited Ms. Davidson to "simple, routine, and repetitive tasks," "simple work-related decisions," and "few changes in the work setting" with "routine job duties that remain static and are performed in a stable, predictable work setting" and any changes "occur[ing] infrequently" and being "adequately and easily explained."  (*Id.*)  Consistent with opinions suggesting moderate limitations in performing at a consistent pace, the ALJ limited Ms. Davidson to "simple, routine, and repetitive tasks, but not at a production rate pace, for example, no assembly line work."  (*Id.*)

Ms. Davidson argues that the RFC does not articulate the exact same limitations set forth in the opinions, pointing to the ALJ's articulated limits on assembly line work, interaction, and changes.  (ECF Doc. 11, pp. 21-22.)  But the ALJ was not required to incorporate the psychological opinions into the RFC.  *See Poe*, 342 F. App'x at 157.  Certainly, she was not required to adopt those opinions "verbatim" or "wholesale."  *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015); *see also Moore v. Comm'r of Soc. Sec.*, No. 1:13-CV-00395,

2013 WL 6283681, at *7–8 (N.D. Ohio Dec. 4, 2013).  In this case, the undersigned finds the ALJ did not ignore Ms. Davidson's mental health impairments or fail to account for limitations resulting from those impairments in the RFC.  Indeed, much of the specific "opinion" language highlighted in Ms. Davidson's brief was so general that it is not apparent how such limitations could have been specifically incorporated into the vocational limitations of an RFC.

As to the medical opinions of the state agency medical consultants Dr. Hinzman and Dr. Siddiqui, Ms. Davidson challenges the ALJ's reliance on these opinions because those doctors did not conduct their review based on a "complete" record.  (ECF Doc. 11, pp. 23-25.)  The undersigned addressed this argument in Section VI.B.1. *supra* and found it be without merit.

For all of the reasons set forth above, the undersigned finds Ms. Davidson has not met her burden to prove that the ALJ's ignored Ms. Davidson's medically determinable impairments, failed to account for limitations resulting from those impairments in the RFC, or improperly evaluated the medical opinion evidence in a manner that deprived the RFC of the support of substantial evidence.  Accordingly, the undersigned finds Ms. Davidson's second assignment of error to be without merit.

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.


May 15, 2023

                                        */s/Amanda M. Knapp*
                                        _____
                                        AMANDA M. KNAPP
                                        United States Magistrate Judge

## **<u>OBJECTIONS</u>**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 Dated: April 17, 2023(1985).